JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal from a jury verdict, following trial before Judge Timothy J. McGinty, that convicted appellant Anthony Shafer on one count of rape of a child under the age of thirteen and four counts of gross sexual imposition ("GSI"). He submits as error, among others, a defective indictment, incorrect jury instructions, prosecutorial misconduct, denial of due process, erroneous sentencing, and in his stipulation to be classified as a habitual sexual offender. We affirm in part, reverse in part and remand.
 {¶ 2} From the record we glean the following: Sometime in 1992 or 1993 Shafer met the female victim and her parents at a church in Cleveland and, because of attendance in a weekly Bible study group, became friends. In 1996, at approximately the same time that Shafer's marriage was breaking up, he began to spend more time with that family. He would visit their home several times a week, occasionally cook meals for them, and frequently brought his young sons with him. He soon had a key and free access to the family's home, and he stayed there for several weeks around June 1997, when the family took an extended vacation to Florida.
 {¶ 3} Both Shafer, then thirty-two years of age, and the parents agree that around 1997 the victim, then age eleven years, acted as though she had a "crush" on him because she would always follow him around, and wanted to be near him or sit on his lap. On one occasion as the family and Shafer were watching a "Jerry Springer Show" dealing with relationships between very young women and much older men, the group joked that maybe Shafer and the victim would marry someday. Shafer claimed that in order to set appropriate boundaries he asked the father whether he could engage in a relationship with the victim when she became eighteen years old, and that the father responded along the lines of, "we'll see." Although the father denied that any such conversation had taken place, Shafer stated that he was shocked and appalled by the response. The parents contended that, at the time, they did not notice anything that would indicate that Shafer and their daughter had engaged in any inappropriate behavior.
 {¶ 4} In September 1997, Shafer, the parents, and several others decided to form their own non-denominational church and to have Shafer serve as the pastor. To this end, the parents provided him with access to their credit card, bought him a used car for $600 and provided a cell phone and pager. Shafer, who at this time was collecting worker's compensation benefits,[1] would also receive any donations from members of the congregation. By September of 1998, the church had not progressed as hoped, was losing money, and was disbanded. It appears some bitterness developed between Shafer and the parents, and he no longer associated with the family.
 {¶ 5} Sometime in early 1999, the victim was having trouble sleeping and while talking with her mother told, in a limited fashion, about how Shafer had touched her inappropriately and kissed her. While both parents were disturbed by her comments, they took no action until August of 1999, when, in another late-night conversation, she claimed that he had touched her buttocks, breasts and genital area. The parents then called the police and Cleveland Patrolman Raymond O'Connor took a statement from the victim in which she alleged inappropriate touching, but no conduct which would form the basis for a rape charge. In December of 1999, during an interview with Detective Alan Strickler of the Sex Crimes Unit, she alleged not only inappropriate kissing and touching by Shafer, but also two instances where he had her perform oral sex on him, and one occasion when he had digitally penetrated her in the family's kitchen while her parents and his two sons were watching television in the adjoining living room.
 {¶ 6} Shafer was indicted for two counts of rape of a child under the age of thirteen, in violation of R.C. 2907.02, with a sexually violent predator specification, and four counts of gross sexual imposition of a child under the age of thirteen, in violation of R.C.2907.05.
 {¶ 7} Following pre-trial discovery and two amended bills of particulars by the State, the case proceeded to trial and the jury returned verdicts of guilty on one count of rape and four counts of gross sexual imposition, and specifically found that the victim was under the age of thirteen at the time of the commission of each crime. Shafer was sentenced to five years in prison on the rape count, and one year in prison on each GSI count, to run concurrent to one another but consecutive to the sentence for rape, and advised that he would be subject to three years of post-release control.[2] At a subsequent sexual predator hearing, the parties stipulated that Shafer would be classified as a habitual sexual offender not subject to community reporting requirements.
 {¶ 8} In the first of his ten assignments of error, Shafer claims that the judge erred in amending the indictment to expand the time frame during which his alleged offenses were committed. While the original indictments specified that the two rape counts in question were alleged to have occurred from March to May 1997, during jury selection the judge noted that the indictment was being amended to include dates between March 1997 and September 1998. The GSI's, charges, however, were originally alleged to have occurred "from 1997 to 1998" and remained unchanged.
 {¶ 9} The bill of particulars initially filed by the State was more specific in describing the conduct alleged in the indictment but repeated the original time frame, the first amended bill identified the victim, and the second amended bill, filed eleven days before trial, stated that the March 1997 to September 1998 time frame was to apply to all counts of the indictment, not just the GSI counts.
 {¶ 10} Shafer's lawyer did not object to the amendment to the indictment on the record; nor did he contest either amendment to the original bill of particulars. Rather, he affirmatively assented at the hearing on March 26, 2001, by explicitly clarifying for the judge what the proposed amendments would be. As such, we evaluate this assignment of error under a plain-error analysis only, under the guidelines of Crim.R. 52.
 {¶ 11} Crim.R. 52(B) states that, "Plain error or defect affecting substantial rights may be noticed although they were not brought to the attention of the court." Error is not plain error unless the outcome of an accused's trial clearly would have been otherwise, but for the error.[3] The standard for plain error is whether substantial rights of the accused are so adversely affected as to undermine the fairness of the guilt determining process.[4] But notice of plain error is to be taken with the utmost of caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.[5]
 {¶ 12} Crim.R. 7(D) provides that: "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. If any amendment is made to the substance of the indictment * * * or to cure a variance between the indictment * * * and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impaneled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury. * * *"[6]
 {¶ 13} The precise date and time of an offense are generally not elements of an offense.[7] According to Crim.R. 7(B), "[t]he indictment * * * shall contain a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations not essential to be proved. It may be in the words of the applicable section of the statute as long as the words of that statute charge an offense, or in any words sufficient to give the accused notice of all the elements of the offense with which he is charged. * * *" Where such crimes constitute sexual offenses against children, indictments need not state with specificity the dates of alleged abuse, so long as the prosecution establishes that the offense was committed within the time frame alleged.[8] "The basis for this rule is easily understood in sexual abuse cases where young victims cannot identify the specific date on which the crime(s) occurred."[9]
 {¶ 14} Shafer points out that an accused has a right, conferred by Article I, Section 10, of the Ohio Constitution, to "* * * be tried on the same essential facts on which the grand jury found probable cause."[10] Where one of the vital elements identifying the crime is omitted from the indictment, it is defective and cannot be cured by the court as such a procedure would permit the court to convict the accused on a charge essentially different from that found by the grand jury.[11]
 {¶ 15} State v. Vitale, supra, advances the proposition that, where the State amends an indictment to include later events at a different time and place than those alleged in the indictment, the defendant is deprived of the right to indictment by grand jury for those later events. We find, however, that State v. Vitale, supra, is distinguishable, and that temporal deviations in an indictment, based on information eventually elicited in discovery, need not necessarily deprive a defendant of the right to indictment by grand jury, and need not alter the identity of a crime so as to make amendment of the indictment impermissible under Crim.R. 7(D).
 {¶ 16} In Vitale, the defendant was indicted for a theft offense alleged to have occurred on June 14, 1991, when he drove his car from the grounds of the repair garage without paying for its repairs. At the bench trial, the State presented evidence indicating that he originally had permission to take the car from the garage, but at the garage owner's home a week later, returned it and later drove it away without indicating he was not going to pay for the repairs. Accordingly, the State moved to amend the indictment to include a different potential theft occurring at a different address, over an expanded period of time. In reversing the conviction based on the fact that the time and place amendments "obviously" raised the specter that Vitale might have been convicted on facts not contemplated by the grand jury, the court noted that, "[a]bsent language indicating the grand jury's intent to permit a conviction based on more than one incident of criminal conduct, a court cannot assume that a grand jury would have included in its indictment an additional incident of criminal conduct."[12]
 {¶ 17} In Shafer's case, however, the grand jury concluded that probable cause existed to indict Shafer for "engaging in sexual conduct with [a victim], not his spouse, whose age at the time of said sexual conduct was under thirteen years * * *." Shafer's argument assumes the offense date to be an essential fact, for purposes of indictment or proof, and it need not be. Specificity as to the time and date of an offense is not required in an indictment. Under R.C. 2941.03: "[a]n indictment or information is sufficient if it can be understood therefrom: * * * (E) That the offense was committed at some time prior to the time of filing of the indictment * * *." An indictment is not invalid for failing to state the time of an alleged offense or doing so imperfectly.[13] The State's only responsibility is to present proof of offenses alleged in the indictment, reasonably within the time frame alleged.[14]
 {¶ 18} Thus, the grand jury could have easily concluded that Shafer engaged in the conduct for which he was convicted, albeit the specific conduct may have turned out to have taken place at some later time than originally specified in the indictment, but not necessarily in any different manner or in any different place. To assume so is conjecture, because we do not have the benefit of the grand jury's testimony before us, and is fundamentally irrelevant to the ultimate issue, which is if Shafer raped the victim, not when.
 {¶ 19} The crime of rape does not contain an element of time, as does, for example, crimes relating to the sale of liquor on Sundays, and the victim was indisputably under the age of thirteen at all relevant times. Additionally, this rape indictment is part of a series of indictments charging Shafer with sexual abuse over a period of time and, therefore, distinguishable from Vitale, involving an indictment for one discreet act of theft, and reversed because the convicted act occurred on a distinct, later day, at a different place. Accordingly, the State's amendment to the indictment before the jury was empaneled presents no constitutional violation.
 {¶ 20} We are aware of State v. Barnecut, supra, which plainly holds: "Appellant's due process rights to a fair trial were violated when the trial court allowed the indictment to be amended with regard to the first two counts after the state's case-in-chief was completed. If no evidence is presented that the alleged offenses occurred within the bracketed time frames specified in the indictment, the counts in the indictment relating to those offenses should be dismissed. Any variance of proof outside the parameters of time established by the indictment may constitute a separate offense. This analysis suggests a bright-line test, i.e., that an accused be tried for the crimes alleged in the indictment, and that any evidence outside the time period established in the indictment may constitute a separate offense requiring separate process. This bright-line approach is particularly appropriate in criminal child abuse cases. In such cases, the state is granted greater leeway in charging that the crime(s) took place within a fairly broad time frame. The quid pro quo is that the state prove what it charged."[15]
 {¶ 21} We decline to follow the holding of Barnecut, however, for two reasons. First, it is plain from the record the amendment at issue was simply not a problem. There was no objection to the amendment, as close to the start of trial as the jury voir dire. Shafer's failure to object to the otherwise proper amendment or to request a continuance to ensure a fair trial by undertaking further preparation or discovery which, we infer he did not think necessary, restricts our review to whether the judge's acceptance of the amendment deprived him of a fair trial.[16] The very viability of the test set out in Barnecut is not uniformly accepted in Ohio, and is not good law in some districts.[17]
 {¶ 22} Second, the only possible relevance an asserted time frame could have to Shafer would be in the instance where he would assert an alibi in defense of the charge, under Crim.R. 12.1, and he has asserted none. His defense of the case was a complete denial of all charges, within the entire, "amended" time frame of March 1997 to September 1998, and we decline to grant Shafer a second chance to fully litigate his case without realistic cause. We conclude that the amendment to the rape count of the indictment did not undermine the fairness of the guilt determining process, and there was no plain error. This assignment of error is without merit.
 {¶ 23} Shafer next claims it was error to deny a jury instruction that, for each count of the indictment, it would require a unanimous determination identifying the specific conduct for which he was convicted. As part of his charge, the judge instructed the jury:
 {¶ 24} "The charges set forth in each count of the indictment constituted a separate and distinct matter. You must consider each count and the evidence applicable to each count separately, and you must state your finding as to each count uninfluenced by your verdict by the other counts. So each count is a separate, distinct matter for the jury and it doesn't matter what you did in the count before or the count after." He also instructed the jury that it must reach a unanimous verdict on each count.
 {¶ 25} In State v. Thompson,[18] the Ohio Supreme Court observed:
 {¶ 26} "Appellant also argues, in [his next] proposition of law, that the jury should have been instructed to make a specific finding as to whether appellant committed either vaginal rape, anal rape or both. Appellant argues that the omission of this instruction was error because some jurors may have found him guilty of one, but not the other, type of rape. Thus, appellant believes there might have been a non-unanimous finding of the type of rape. The answer to appellant's contention is again, no.
 {¶ 27} "R.C. 2907.02(A)(2) is one part of Ohio's rape statute. This section provides:
 {¶ 28} "`No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.'
 {¶ 29} "`Sexual conduct' is defined by R.C. 2907.01(A) as `* * * vaginal intercourse * * *[,] anal intercourse, fellatio, and cunnilingus between persons * * *.' Therefore, the jury had only to find that one of these forms of sexual conduct took place between the victim and appellant to find that a rape had been committed. The statute simply does not require, as appellant asserts, that a specific finding be made as to the type of rape. Consequently, it was not error for the trial court to refuse to instruct the jury that it must make such a specific finding. The fact that some jurors might have found that appellant committed one, but not the other, type of rape in no way reduces the reliability of appellant's conviction, because a finding of either type of conduct is sufficient to establish the fact of rape in Ohio."[19]
 {¶ 30} While Thompson deals with four different types of rape essentially committed at the same time, Ohio's courts of appeals have also held that, where multiple independent acts of rape may have been committed, but less than all are charged as counts in an indictment, the jury must merely conclude that the defendant engaged in an act prohibited by the statute, and a jury is presumed to have reached a unanimous verdict, pursuant to a "unanimity" jury instruction substantially similar to the one given by the judge in this case.[20]
 {¶ 31} In State v. Johnson,[21] the Ohio Supreme Court held that where a statute sets out different "distinct conceptual groupings," of prohibited conduct, a court should issue a special jury instruction that they must maintain unanimity within one of the groupings in order to be considered to have reached a unanimous verdict.[22]
This rule was announced in a Federal case wherein a statute prohibited two distinct categories of conduct: receiving, concealing, storing on one hand, and bartering, selling, or disposing on the other — of stolen vehicles moving in interstate commerce.[23]
The court held that the two categories of activity were sufficiently dissimilar that a conviction obtained by "mixing" categories was a non-unanimous consensus among the jury as to what exactly the defendant had done wrong.[24]
 {¶ 32} Such is not the case here, as held above by Thompson and its progeny. Rape, defined under R.C. 2907.01 and .02 as any vaginal and anal intercourse, fellatio, cunnilingus, and insertion of an object into the vaginal or anal cavity with a child less than thirteen years of age, and GSI, defined under R.C. 2907.01 and .05 as any unwanted touching of an erogenous zone, including without limitation the thigh, genitals, buttock, pubic region or female breast are each their own single variation on their respectively perverted themes. Hence, State v.Johnson is not helpful.
 {¶ 33} No specific jury instruction was needed to require the jurors to agree on a single given act of either rape or GSI, in order to ensure unanimity, given the judge's general instruction to return a unanimous verdict. We further reference Crim.R. 30, which provides, "[o]n appeal, a party may not assign as error the giving or failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." There was no plain error in the omission of such an instruction, and this assignment of error is not well taken.
 {¶ 34} Shafer next contends that it was error to fail to instruct the jury that any conviction for gross sexual imposition must be based upon an act that occurred at the family's home and not at another location. The victim averred that in addition to three acts of rape and numerous, weekly instances of GSI that occurred at her home, Shafer fondled her breasts and buttocks in the basement of his mother's home where they and his sons had gone to do laundry. She claimed that as they walked up the stairs, he grabbed her chest, and when his brother, Robert, opened the basement door, she turned around and slapped Shafer, and that Robert saw the entire incident.
 {¶ 35} While the bill of particulars produced by the State, and its subsequent amendments, alleged that all of the acts of rape and GSI alleged occurred in the family's home, without objection the State questioned the victim at length about GSI that purportedly occurred in Mrs. Shafer's basement. Shafer cross-examined the victim at length as well and even presented his brother, Robert, as a witness on his behalf, partly to vouch for his decency and innocence, but also to deny seeing what the victim had claimed took place.
 {¶ 36} While Shafer again directs us to State v. Vitale for the proposition that a defendant has a right to receive a bill of particulars detailing the allegations upon which the prosecution wishes to go to trial, we note that the Ohio Supreme Court has announced the standard to apply to an alleged error to which proper objection was made.
 {¶ 37} "A trial court must consider two questions when a defendant requests specific dates, times or places on a bill of particulars: whether the state possesses the specific information requested by the accused, and whether this information is material to the defendant's ability to prepare and present a defense."[25]
 {¶ 38} From the overall record of the case, and Shafer's failure to object to the omission of any limiting instruction about the probative value of testimony regarding any incidents of GSI supposedly taking place at another location, we conclude that he waived all but plain error. The crucial inquiries, under State v. Lawrinson[26] and the plain error standard of review are, respectively, whether such omission of allegations in the bill of particulars and the lack of a limiting instruction impaired Shafer's ability to present a defense to the charges and whether such failure impeded the fairness of the proceedings against him. We think not. This assignment of error has no merit.
 {¶ 39} Shafer submits it was prosecutorial misconduct during closing argument to appeal to the passions of the jury and improperly attack his lawyer. We again note that Shafer waived all but plain error in raising this challenge for the first time on appeal.[27]
The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights.[28]
The touchstone of this analysis "is the fairness of the trial, not the culpability of the prosecutor."[29] Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning.[30]
Counsel is entitled to latitude in closing arguments as to what the evidence has shown.[31]
 {¶ 40} Shafer now takes issue with several comments the prosecutor made during closing argument that he sees as unfairly prejudicial.
 {¶ 41} The first class of comments are those purporting to exhort the jury to do its duty to protect the victim and the community from Shafer. The prosecutor stated that the child needed to solve emotional problems created by the abuse perpetrated on her, and that she needed a "* * * solution. And her solution begins here. This girl came in here and bared her heart to you. And you've got to believe her." He also stated, "We, as a society, have a duty to do what [the victim's parents] are doing. We have a duty to protect this child."
 {¶ 42} It is unquestionably improper to call upon a jury to protect its community by incarcerating a given individual, because such comments distort the ability of a jury to impartially decide guilt or innocence based on an objective view of the evidence put before them.[32]
 {¶ 43} Conversely, Shafer cites as prejudicial the prosecutor's statements: "As a parent, what would you do? Listen to your kid. You evaluate what they have to say. And as a parent, you owe them a duty to protect them. How must [the victim's parents] feel? * * *" Taken in context, however, this statement refers to the decision of the parents to go to the police with their concerns. It was not offered to, nor in context can it be inferred that this comment was designed to, inflame the passions of the jury to protect the victim as a surrogate parent. It was not improper.
 {¶ 44} Shafer takes issue with the prosecutor calling him a monster and pedophile, and describing his alleged actions as "classic pedophilia," in gaining the victim's trust, secretly abusing her and making her promise she would not tell anyone about their activities or his feelings for her. To the extent these comments tend to vilify Shafer and seek to have the jury convict him based on the jury's loathing, they are improper for the same reasons that a prosecutor may not appeal to a jury's sense of community protection. On the other hand, if the prosecution's witnesses were believed, Shafer's conduct was indicative of pedophiliac behavior and the State's comments are legitimate characterizations of the evidence presented.
 {¶ 45} Shafer asserts that it was prejudicial to refer to his attorney a few times as a "spin doctor." In State v. Williams,[33] the Eighth District refused to find prosecutorial misconduct in closing arguments that described evidence as a "smoke screen" to "throw you off." In State v. Hill,[34] the First District found that a closing argument improperly denigrated defense counsel where the prosecution used words such as "put smoke up in the air" and "create smoke." However, the Hill court then held that the defendant failed to object and the comments did not prejudicially affect the defendant's substantial rights.[35]
 {¶ 46} In State v. Smith,[36], the Court stated that prosecutorial misconduct occurred where the state not only described the defense as a smoke screen but repeatedly described the defense as "lies," "garbage," "garbage lies," and "well-rehearsed lie." Finally, in Statev. Bey,[37] it reviewed a prosecutor's closing which accused the defense of confusing the issues to create doubt. The Court stated that although defense counsel may arguably have been denigrated, the statements were not prejudicial.[38]
In the context of these cases and the entire closing argument in the case before us, Shafer's defense was not prejudiced by the use of the phrase "spin doctor."
 {¶ 47} Moreover, taken as a whole, the above-cited improper comments did not undermine the fairness of the proceedings against Shafer or prejudiced his ability to have a fair trial. The State's case, at closing argument, concentrated on the depiction of the victim as a credible, forthright witness and on the evasiveness or unbelievability of Shafer. Bolstering one's own witnesses and minimizing the defense based upon the testimony presented, but not the prosecutor's personal opinion, is proper in closing argument.[39] To accomplish this task, the prosecutor largely highlighted the girl's frank honesty and lack of a motive to subject herself to the unpleasantness of having to testify about all the things she alleged Shafer did to her. He contrasted this with what he perceived to be the inconsistencies in Shafer's statement given to police prior to his arrest, evasiveness about how often he went to the family's home or inconsistencies between his statement and the victim's trial testimony.
 {¶ 48} On the entire record, there was no plain error and the fairness of the guilt-determining process was not affected by the prosecutor's comments. Absent the comments, we believe the jury still would have found Shafer guilty beyond a reasonable doubt.[40]
 {¶ 49} We are aware of our holding in State v. Hart,[41] where we reversed a conviction of an individual convicted of vandalism and felonious assault, basically, on the testimony of one witness, the victim. As such, the jury's evaluation of the victim, as both a witness and a victim, was paramount in determining Hart's guilt. We found, based on prosecutorial misconduct, that the convictions should be reversed. In contrast to this case, however, the errors were much more egregious and numerous. In Hart, the prosecutor asked the jurors to put themselves in the shoes of the victim, blatantly told the jury that, in his opinion, a guilty verdict would make the system fair and told the jury to find the defendant guilty although the evidence adduced at trial may not have actually met all elements of the crime charged. In addition, the prosecutor elicited opinion evidence about the victim's credibility from other State witnesses. State v. Hart is clearly distinguishable. This assignment of error is not well taken.
 {¶ 50} In two more assignments of error Shafer contends he was denied effective assistance of counsel and that the jury should have been instructed that a witness's opinion about the victim's credibility could not be considered for its truth but only in the jury's evaluation of the witness's credibility.
 {¶ 51} Ineffective assistance claims are governed by a two-prong test first articulated in Strickland v. Washington.[42]
First, the appellant must show that counsel's performance "fell below an objective standard of reasonableness," and "made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment."[43] Second, the appellant must demonstrate prejudice — i.e., "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."[44]
"A reasonable probability is a probability sufficient to undermine confidence in the outcome."[45]
 {¶ 52} Here, Shafer broadly reasserts "the various errors" discussed in his merit brief. With the exception of his claim challenging consecutive sentences, infra, none of these errors have merit such that the outcome of the trial would change or the case should be remanded.
 {¶ 53} In addition, he asserts that his lawyer was ineffective because he actually sought out opinion testimony from Detective Strickler about whether the victim was being truthful when he took her statement at the Sex Crimes Unit offices. Shafer now contends that his lawyer was deficient when he failed to request an instruction requiring the jury to evaluate that evidence only for its value in determining Detective Strickler's credibility, and not of substantive evidence of his guilt. We disagree.
 {¶ 54} Shafer points to the case of State v. Boston,[46] where the Ohio Supreme Court held that "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant,"[47] and that such testimony constituted reversible error. That holding, however, was premised on the fact that the testimony was prejudicial and improper because the child-declarant claiming abuse was a six-year-old child determined by the trial judge to be incompetent to testify. As such, any expert vouching for the child's credibility usurped the function of the jury in making that determination, and violated the right of that defendant to effectively confront his accuser.
 {¶ 55} Such is not the case with Shafer. His jury had a full opportunity to gauge the victim's credibility because she testified. In addition, Shafer's lawyer opened the door to the testimony; there would be no prejudice to his right to confront his accuser if he introduced such opinion testimony in order to attempt to demonstrate bias. Shafer sought to demonstrate that the police systematically give no presumption of innocence to potential defendants. His lawyer pointed out potentially damaging parts of his statement given at the Sex Crimes Unit offices and asked the detective why Shafer would make such admissions: that he was aware that the girl had a crush on him, and asking her father if he could have a serious relationship with her when she became eighteen. The detective answered that he thought Shafer did so to make himself look good, and make the victim look like a scorned, vengeful girl. Shafer's lawyer eventually asked the detective for his opinion about his client's guilt, and the detective replied that he thought Shafer was guilty. We find no authority to indicate that, had Shafer requested the limiting instruction he now argues should have been requested, it would have been given. This assignment is overruled.
 {¶ 56} Shafer further contends that his conviction is against the manifest weight of the evidence. "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.)
 {¶ 57} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. * * * `The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"[48]
 {¶ 58} Shafer contends that the victim's testimony, on the whole, was not believable and his conviction a manifest miscarriage of justice because of inconsistencies in her initial disclosure to her mother, the lack of initial or very severe symptoms of abuse, and the fact that her mother attributed any emotional symptoms as the normal growing pains of an adolescent girl. We disagree.
 {¶ 59} The victim testified that her first untoward encounter with Shafer took place when he asked her to accompany him on a test-drive in an automobile he had fixed, shortly before her family vacationed in Florida during the summer of 1997. She claimed he began by stating he wanted to tell her something, but that she would just tell her parents, so she agreed to keep silent. When he told her that he wanted to kiss her and remarked that he had a large penis she claimed she was quite confused but, later that night, he approached her on the second floor of her home and eventually persuaded her to kiss him. She testified that when she finally agreed to the kiss, she was doing so because she was "trusting" him, and understood that she and Shafer were beginning a romantic relationship.
 {¶ 60} The victim testified about increasingly physical encounters with him after her family returned from Florida, which progressed from heavy petting and kissing, to Shafer fondling her under her clothes. She stated she was always home during the week because she was being home-schooled and that the majority of the encounters would take place in the morning, when her father was at work, her mother was sometimes sleeping and Shafer would stop over at the house, ostensibly to speak with her mother about church-related matters.
 {¶ 61} She contended these encounters eventually escalated to Shafer exposing himself and, on two occasions, she put his penis in her mouth. She also testified about how Shafer digitally penetrated her in her kitchen and the incident on his mother's basement stairs. She claimed that throughout this time she was very confused, had trouble sleeping and at times would have crying spells, all of which intensified until, in the Spring of 1999, she finally told her parents a portion of what had taken place between her and Shafer. When she finally told her parents about all that had happened, it prompted the investigation culminating in these charges.
 {¶ 62} The mother generally corroborated her daughter's behavior pattern throughout this time period, though she said she never suspected any abuse by Shafer, that the child's schoolwork had fallen off somewhat, but not much, during that time, and that because she has told of the abuse, she is doing better emotionally.
 {¶ 63} Robert Shafer testified that his brother was a good man who would never do anything like the girl described, that he was a good father to his sons and that the claims about the event on his mother's basement stairs were false.
 {¶ 64} Shafer denied all the allegations and testified about his background in the Navy, his family, his employments as a computer analyst and his background as some sort of minister. He described his meeting and becoming close friends with the family and their frequent social contacts and that, on occasion, he would help out the family with home improvement projects.
 {¶ 65} Shafer described the victim's infatuation with him and his respectable efforts to teach her responsibly in sexual matters, such as an admonition that sex is an activity reserved for marriage and that he was too old for her. He claimed he stopped associating with the family because of hard feelings over the dissolution of the church. He also confirmed as truthful his exculpatory answers in his voluntary statement to Detective Strickler.
 {¶ 66} While here the evidence of the prosecution and the defense conflict, the family's testimony is consistent as is that of Shafer and his brother, and seeing the witnesses testify at trial would seem to be the only way to make any determination about credibility. "Weight of the evidence and credibility are primarily for the trier of fact."[49] We cannot agree that the evidence before us is against the manifest weight of the evidence, such that a new trial is needed. This assignment of error is not well taken.
 {¶ 67} Shafer asserts that it was error to instruct the jury to find that he was the same Anthony Shafer about whom the witnesses testified. While he alleges that his constitutional rights have been violated, we must point out that the stipulation referred to by the judge specifically stated that the "Anthony Shafer" or "Tony Shafer," about whom a given witness was testifying, was the individual seated at the defense table, and no objection was made. There was no instruction given that if a rape or GSI was proven to have occurred, the jury had to find this defendant was the perpetrator. This assignment of error has no legal basis whatsoever.
 {¶ 68} Shafer next challenges the consecutive sentences pronounced on his GSI convictions. Under R.C. 2929.14(E)(4), a judge may sentence a defendant to consecutive terms of imprisonment for multiple crimes in the following circumstances:
 {¶ 69} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 70} "(a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 71} "(b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 72} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."[50]
 {¶ 73} In making such findings that consecutive sentences are appropriate, a judge must articulate, on the record, the reasons for the findings made.[51]
 {¶ 74} The judge remarked at sentencing that Shafer had caused a large degree of harm, not only to the victim, but to both his and her family, as well. He pointed out that his refusal to admit his guilt, in the face of the girl's testimony — which did describe Shafer's actions in classic pedophiliac terms — subjected her to the stress and fear of testifying at trial. He also noted a high probability that Shafer would re-offend if not incarcerated, albeit without saying why.
 {¶ 75} These findings, arguably, could support the requirement of R.C. 2929.14(E) that consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. There is, however, nothing in the sentencing transcript to indicate that the judge found Shafer to satisfy any of the criteria listed in R.C.2929.14(E)(4)(a), (b) or (c), one of which must be found in order to validly impose consecutive sentences upon an offender.[52] This assignment of error has merit.
 {¶ 76} Finally, Shafer urges us to vacate his stipulated habitual sexual offender not subject to community reporting classification based upon our disposition of his other assigned errors. We note Shafer and the State entered into this stipulation by journal entry on September 13, 2001, but the notice of appeal in this case was filed on June 5, 2001. Errors may only be assigned pursuant to a valid notice of appeal, under App.R. 4, within thirty days of the judgment or order appealed from. We cannot consider this error.
Conviction affirmed, sentence vacated and case remanded for resentencing.
It is ordered that appellant and appellee share the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, A.J., CONCURS IN JUDGMENT ONLY.
 PATRICIA A. BLACKMON, J., CONCURS.
[1] Shafer, while working as a computer software/system consultant, was involved in a car accident as a passenger, while he and a co-worker were driving between job sites.
[2] The journal entry, however, orders three years of post-release control and payment of court costs.
[3] State v. Nicholas (1993), 66 Ohio St.3d 431, 436.
[4] State v. Swanson (1984), 16 Ohio App.3d 375, 377.
[5] State v. Pumpelly (1991), 77 Ohio App.3d 470, 475.
[6] See also, R.C. 2941.30.
[7] State v. Hensley (1991), 59 Ohio St.3d 136, State v. Lawrinson
(1990), 49 Ohio St.3d 238, State v. Sellards (1985), 17 Ohio St.3d 169,172, State v. Stepp (1997), 117 Ohio App.3d 561, State v. Mundy (1994),99 Ohio App.3d 275, State v. Ambrosia (1990), 67 Ohio App.3d 552, Statev. Morgan (May 11, 2001), Lucas App. No. L-00-1114.
[8] State v. Barnecut (1988), 44 Ohio App.3d 149, 152.
[9] Id.
[10] State v. Vitale (1994), 96 Ohio App.3d 695, 699.
[11] State v. Headley (1983), 6 Ohio St.3d 475, 478-479 (cites omitted).
[12] Id.
[13] See R.C. 2941.08(B) and (C). See also, State v. Jordan (Nov. 25, 1998), Cuyahoga App. No. 73364, State v. Mundy,99 Ohio App.3d at 312-313, State v. Murrell (1991), 72 Ohio App.3d 668, 671, State v.Russell (Apr. 10, 1991), Summit App. No. 14714, State v. Herrin (1982),6 Ohio App.3d 68, all holding purely date-amendments to indictments to be proper.
[14] State v. Daniel (1994), 97 Ohio App.3d 548.
[15] State v. Barnecut, 44 Ohio App.3d at 153.
[16] We pause to note that the defendant in State v. Barnecut did, in fact, object to the amendments to his indictments.
[17] See Footnote 12.
[18] (1987), 33 Ohio St.3d 1.
[19] Id. at 11.
[20] State v. Bell (1996), 112 Ohio App.3d 473, State v. Ambrosia
(1990), 67 Ohio App.3d 552, State v. Hunter (Feb. 12, 1991), Montgomery App. No 11853, State v. Penson (Feb. 26, 1990), Montgomery App. No. 9193.
[21] (1989), 46 Ohio St.3d 96.
[22] Id. at 104-105.
[23] See United States v. Gipson (C.A.5, 1977), 553 F.2d 453.
[24] Id.
[25] State v. Lawrinson (1990), 49 Ohio St.3d 238, 239.
[26] Id.
[27] State v. Twyford (2002), 94 Ohio St.3d 340.
[28] State v. Lott (1990), 51 Ohio St.3d 160, 165, citing Statev. Smith (1984), 14 Ohio St.3d 13, 14-15.
[29] Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947,71 L.Ed.2d 78, 87.
[30] Donnelly v. DeChristoforo (1974), 416 U.S. 637, 647,94 S.Ct. 1868, 1873, 40 L.Ed.2d 431, 439; State v. Hill (1996), 75 Ohio St.3d 195,204.
[31] State v. Smith, 80 Ohio St.3d at 111; State v. Loza (1994),71 Ohio St.3d 61, 78.
[32] See generally, United States v. Monaghan (D.C. Cir. 1984),741 F.2d 1434, 1441, State v. Draughn (1992), 76 Ohio App.3d 664,670.
[33] (Mar. 7, 1996), Cuyahoga App. No. 68609.
[34] (Feb. 12, 1999), Hamilton App. No. C-971098.
[35] Id.
[36] (1984), 14 Ohio St.3d 13, 14.
[37] (1999), 85 Ohio St.3d 487.
[38] Id. at 494.
[39] State v. Draughn, supra.
[40] State v. Smith (1984), 14 Ohio St.3d 13, 14-15.
[41] 2002-Ohio-1084.
[42] (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.
[43] Id. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.
[44] State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.
[45] State v. Sanders, supra, quoting Strickland, 466 U.S. at 694,104 S.Ct. at 2068, 80 L.Ed.2d at 698.
[46] (1989), 46 Ohio St.3d 108.
[47] Id. at syllabus.
[48] State v. Thompkins (1997), 78 Ohio St.3d 380, 387 (internal cites omitted.)
[49] State v. DeHass (1967), 10 Ohio St.2d 230, syllabus, paragraph 1.
[50] R.C. 2929.14(E)(4).
[51] R.C. 2929.19(B)(2)(d); State v. Jones (2001), 93 Ohio St.3d 391,399.
[52] R.C. 2929.14(E), see also State v. Colegrove,2002-Ohio-1825.